683 A.2d 1181

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Gilbert JONES, Appellant.**

Supreme Court of Pennsylvania.

Argued April 25, 1995.

Decided Sept. 18, 1996.

164

Mitchell Scott Strutin, for Gilbert Jones.

Catherine Marshall, Robert A. Graci, Attorney General's Office, for Com.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This is an automatic direct appeal[1] from three sentences of death imposed upon Appellant following his convictions on four counts of Murder in the First Degree[2], two counts of Possession of Instrument of Crime[3] and one count of Burglary.[4] Following a penalty hearing, the jury returned verdicts of death on three of the murder counts and a sentence of life imprisonment on the fourth murder count.[5] Post-trial motions were filed and argued. The trial court ultimately denied those

1. *See*, 42 Pa.C.S. §§ 722(4); 9711(h)(1); Pa.R.A.P. Rule 702(b).

2. 18 Pa.C.S. § 2501(a).

3. 18 Pa.C.S. § 907.

4. 18 Pa.C.S. § 3502.

5. The three verdicts of death were each based upon the jury's finding of one aggravating circumstance which outweighed any mitigating circumstances. 42 Pa.C.S. § 9711(c)(iv). The following three mitigating circumstances were found by at least some of the jurors: defendant was under the influence of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2); the age of the defendant at the time of the crime, 42 Pa.C.S. § 9711(e)(4); and other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8). It is unclear from the record, however, whether the precise aggravating circumstance presented and found was 42 Pa.C.S. § 9711(d)(10) or (d)(11). While the language employed by the court during trial indicates that the precise aggravating circumstance presented and found was (d)(11), the Commonwealth, in its brief to this court, indicates that the aggravating circumstance presented by it was (d)(10). However, for purposes of the present appeal, it is inconsequential precisely which aggravating circumstance was, indeed, presented and found, first, because Appellant does not challenge the finding of the aggravating circumstance, and second, because with respect to our statitorily imposed review, *post*, we have considered this matter as if either (d)(10) or (d)(11) were found.

motions. Appellant was then formally sentenced to the three sentences of death, one life sentence, a concurrent ten (10) to twenty (20) years on the burglary charge and one to five years, also concurrent, on the possession of instruments of crime charge. For the reasons that follow, we affirm the convictions and the judgments of sentence.

As in all cases in which the death penalty has been imposed, this court is required to conduct an independent review of the sufficiency of the evidence even where, as here, the defendant has not specifically challenged the conviction on that ground. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt. *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986). So viewed, the evidence establishes the following.

On Sunday, December 23, 1990, at approximately 2:45 p.m., Appellant met Edna Dorsey, a former girlfriend, at Red's Corner Lounge located at 18th and Moore Streets in South Philadelphia. In a statement given to police, Appellant indicated that shortly after arriving at the lounge, he informed Ms. Dorsey that he was getting married but asked her if she would still see him after he was married. When Ms. Dorsey refused, Appellant pulled a gun from his person and shot Ms. Dorsey in the neck causing her to fall from the bar stool. As Ms. Dorsey lay on the floor, Appellant shot her three more times. Ms. Dorsey died as a result of these gunshot wounds. Appellant then fired a fifth bullet which struck another patron, Leroy Anderson, in the head. Fortunately, Mr. Anderson's wound was not fatal.

About a half hour later on this same date, Appellant returned to his home at 6133 Walnut Street. As he approached

his house, Appellant saw Earl Jones enter the house next door.[6] Appellant proceeded into his own home, retrieved a .30–.30 caliber rifle, and, armed with both the rifle and a revolver, went next door in search of Earl Jones. Appellant forced his way in the front door and chased Earl Jones upstairs. Earl Jones entered one of the bedrooms, warned Jacqueline Jones, Alan Whitfield, and Felicia Hubert, all three of whom were in that bedroom watching television, that Appellant was after him. After issuing that warning, Earl Jones jumped from the bedroom window to safety. Appellant entered the bedroom and shot and killed all three of the above-mentioned individuals.

Following the shootings, Appellant fled and barricaded himself in his own home. While there, Appellant maintained telephone communications with the police during which time he informed the police that he was armed. The hostage negotiator with whom Appellant spoke asked no questions regarding the shootings, but tried only to convince Appellant to surrender peacefully. During these conversations, Appellant repeatedly volunteered that he intended to commit suicide because he did not want to be incarcerated for killing the victims. It was not until several hours later, after having talked with his son, that Appellant finally surrendered to police. Once in custody, Appellant waived his *Miranda* rights and gave inculpatory statements respecting all four murders. A search of Appellant's home produced both a revolver and a .30–.30 rifle as well as numerous rounds of live ammunition.

At trial, Appellant asserted a defense of insanity and diminished mental capacity. In support of his defense, Appellant presented the testimony of family and neighbors who testified as to Appellant's military discharge in 1948 after his having been diagnosed as a schizophrenic psychopath. This evidence consisted of layman testimony regarding Appellant's behavior

6. Some six years earlier, Earl Jones, who bore no familial relationship to Appellant, had stabbed Appellant's son during an apparent fight over a woman. Appellant's son later died from the stab wound. Earl Jones was convicted of voluntary manslaughter in connection with the stabbing, but had recently been released from prison at the time Appellant saw him on December 23, 1990.

patterns and instances of bizarre behavior. However, Appellant did not present any medical expert testimony in support of these defenses. The Commonwealth, on the other hand, presented the testimony of two board-certified forensic psychiatrists who examined Appellant following the murders. Both concluded that, at the time Appellant committed the instant murders, he was not laboring under any mental illness sufficient to deprive him of his ability to appreciate the wrongfulness of his acts or to conform his conduct to the requirements of law.

Our independent review of the record convinces us that the evidence presented was, indeed, sufficient to support Appellant's convictions for four counts of first degree murder, two counts of possession of instrument of crime and one count of burglary. Having concluded that the evidence was sufficient to support the convictions, we shall now address Appellant's particular claims of error.

All but one of Appellant's claims of error allege ineffective assistance of his trial counsel. Generally, trial counsel is presumed to be effective and the defendant bears the burden of proving otherwise. *Commonwealth v. Williams,* 524 Pa. 218, 230, 570 A.2d 75, 81 (1990). To obtain relief on a claim of ineffective assistance of counsel, Appellant is required to show that there is merit to the underlying claim; that counsel had no reasonable basis for his course of conduct; and finally, that there is a reasonable probability that but for the act or omission in question, the outcome of the proceeding would have been different. *Commonwealth v. Douglas,* 537 Pa. 588, 597, 645 A.2d 226, 230 (1994); *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). In reviewing any particular claim of ineffectiveness, we need not determine whether the first two prongs of this standard are met if the record evinces that Appellant has not met the prejudice prong. *Commonwealth v. Travaglia,* 541 Pa. 108, 118, 661 A.2d 352, 357 (1995), *cert. denied* —— U.S. ——, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996).

176

■ Appellant first contends that trial counsel was ineffective in failing to pursue, in post-trial motions, the trial court's denial of his pre-trial motion to suppress certain inculpatory statements made by Appellant both at the time he was barricaded inside his home as well as while he was being transported to the police station. When reviewing a trial court's ruling denying a suppression motion, we must first determine whether the factual findings are supported by the record. Where, as here, it is the defendant who is appealing the ruling of the suppression court, we must consider only the evidence of the prosecution's witnesses and only that evidence of the defense that remains uncontradicted when fairly read in the context of the whole record. If, upon such review, we conclude that the factual findings of the trial court are supported by the record, we are bound by those facts and are permitted to reverse the ruling only if the legal conclusions drawn therefrom are erroneous. *Commonwealth v. Medley*, 531 Pa. 279, 612 A.2d 430 (1992).

■ Initially, Appellant contends that certain inculpatory statements made by him to police during the time he was barricaded inside his home and while he was being escorted to police headquarters should have been suppressed because he had not been given his *Miranda* rights. As this court recently reiterated, *Miranda* warnings are required only where there is custodial interrogation. *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994). Appellant submits that the telephone contact initiated by the police while he was barricaded inside his home constituted custodial interrogation since the police knew at that time that Appellant was a suspect in the shootings, and thus, should have realized that their efforts to coax Appellant from his home via those oral communications was likely to elicit inculpatory statements. He also submits that he was in police custody insofar as the police had his house surrounded and he was, thus, not free to leave. Appellant's claim is wholly without merit. First, contrary to his assertions, he was not in custody at this time and, therefore, was not entitled to *Miranda* warnings. *See Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985). Even

assuming he was entitled to such warnings, the statements made by Appellant during this stand-off were not the product of police interrogation, but rather were unsolicited statements uttered in response to police negotiations designed to encourage Appellant to surrender peacefully and as such, were admissible. *See Commonwealth v. Clark,* 454 Pa. 329, 311 A.2d 910 (1973); *Commonwealth v. Whitley,* 500 Pa. 442, 457 A.2d 507 (1983).

Appellant uttered further inculpatory statements as police were escorting him from his home and driving him to police headquarters as well as when he reached the headquarters. Apparently, as he was being escorted from his home, he yelled to his son that he "should have killed them all" and then, "the ammo is on the hamper." Upon his arrival at police headquarters, an officer in charge of prisoners inquired of the transporting officers as to the reason for Appellant's presence there. One of the transporting officers replied that Appellant was a suspect in several shootings. Although no questions or remarks were directed to Appellant, Appellant blurted out that he had killed the three people inside 6135 Walnut Street, but not the two in South Philadelphia. Because the statements were spontaneous and wholly unsolicited by the police, they were also properly admissible even in the absence of *Miranda* warnings. *Clark, supra.*

Appellant submits further that two statements taken from him while in custody at police headquarters wherein he confessed to all the murders also should have been suppressed because of his refusal to sign either of those statements and that counsel was thus, ineffective in failing to move for their suppression.[7] Apparently, after having been taken into police custody and given his *Miranda* rights, Appellant waived the same and proceeded to make the two detailed confessions. He made corrections to the written statements and initialed

7. The record reveals that trial counsel did file a motion to suppress these statements, however that motion was premised, not on the fact that Appellant had failed to sign the statements, but rather on the basis that they were obtained in a coercive manner and without benefit of having been read his rights. That motion was denied by the trial judge.

those corrections. However, Appellant refused to sign the statements, indicating that he was "not signing anything."

In his brief to this court, Appellant makes only the bald assertion that his refusal to sign these statements renders them inadmissible. Appellant cites no authority for this proposition nor does he offer sound argument for this claim. On that basis alone, we conclude that his claim is without merit. However, his claim is also without merit for the following reasons.

A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. *Commonwealth v. D'Amato*, 514 Pa. 471, 526 A.2d 300 (1987). The test for determining voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession. *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078 (1993). Some of the factors to be considered include: the duration and means of interrogation; the accused's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any and all other factors which may serve to drain one's powers of resistance to suggestion and coercion. *Id.* at 227–228, 634 A.2d at 1087.

Our review of the record reveals neither a coercive environment nor any indication on the part of Appellant that he did not fully understand the rights he was waiving. He was read his *Miranda* rights immediately prior to his giving each individual statement. After the statements were transcribed, he read them, making corrections where necessary and initialing those corrections. In addition, the record evinces that Appellant was coherent and alert during the questioning. On these facts, we cannot conclude that the refusal to sign the statements simply because Appellant never liked to sign "anything" renders the statements inadmissible. Rather, we conclude that the facts surrounding the giving of

these statements supports a finding that they were given voluntarily and knowingly and thus, were properly admitted. Because Appellant's claim lacks arguable merit, trial counsel can not be deemed ineffective for having failed to pursue same. *Commonwealth v. Tilley,* 528 Pa. 125, 149–50, 595 A.2d 575, 587 (1991).

 Appellant next argues that it was error to deny his request to proceed non-jury and that counsel was ineffective in failing to preserve this issue. While acknowledging that his right to proceed non-jury is qualified insofar as a trial court must first approve any such request, Appellant submits that the trial court's refusal in this instance constituted an abuse of discretion.

The law is clear that a request for a non-jury trial is not a matter of right, but rather is subject to the discretion of the trial court. Pa.R.Crim.Pro. 1101; *Commonwealth v. Wallace,* 522 Pa. 297, 561 A.2d 719 (1989). In *Commonwealth v. Morales,* 508 Pa. 51, 64, 494 A.2d 367, 374 (1985), this court reiterated the parameters of a trial court's discretion under Rule 1101, noting as follows.

> The decision whether to grant a defense request for a non-jury trial must be made solely by the trial court, which is charged with the constitutional responsibility of assuring the fair and orderly administration of justice.

> While a prosecutor's concurrence in or opposition to a defense request for a non-jury trial is a relevant consideration in determining the mode of trial, amended Rule 1101 does not deem any one fact or circumstance controlling. Rather, the decision whether to permit a non-jury trial is to be made by the court, taking into account all relevant considerations. *See, e.g., Commonwealth v. Pettiford,* 265 Pa.Super. 466, 402 A.2d 532 (1979), *Commonwealth v. Lee,* 262 Pa.Super. 280, 396 A.2d 755 (1978), and *Commonwealth v. Garrison,* 242 Pa.Super. 509, 364 A.2d 388 (1976) (jury trial waivers properly denied where record indicated "judge shopping").

Application of this standard to the facts of the instant matter reveals no abuse of discretion. After two weeks of jury selection, on the date set for trial, Appellant voiced his desire to discuss with his sister whether or not he should be tried by a jury or a judge. Apparently, Appellant's sister was not even present at the time. Noting the length of time the court had already expended in selecting a jury as well as Appellant's active participation therein, the court indicated its belief that the request was designed solely for purposes of delay and, accordingly, directed that the request would be denied unless defense counsel could present a compelling reason for proceeding non-jury. No further reasoning was given at that time nor does Appellant argue to this court any such further reasons. Moreover, the fact that this request was made immediately following the trial court's denial of Appellant's request to replace both the prosecutor and defense counsel further evinces that this request to proceed non-jury was made solely for purposes of delay. On these facts, we cannot conclude that the trial court abused its discretion in denying the request to proceed non-jury. Appellant's claim, thus, lacks merit and, accordingly, counsel will not be deemed ineffective. *Tilley, supra.*

 The next allegation of error concerns Appellant's competency to stand trial. Specifically, Appellant asserts that his right to due process was violated when he was compelled to go to trial while he was under the influence of certain medication and that trial counsel was ineffective for failing to raise this issue at trial. Appellant submits that his behavior during trial evidences his inability to understand the proceedings and/or to assist in his defense.

 The determination of competency to stand trial rests in the sound discretion of the trial court. It is the burden of the person asserting mental incompetency to stand trial to establish such incompetency. 50 P.S. § 7403(a).[8]

8. We note that in *Commonwealth v. duPont*, 545 Pa. 564, 681 A.2d 1328 (1996), in conformity with *Cooper v. Oklahoma*, —— U.S. ——, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), we held that former section 7403(a) of the Mental Health Procedures Act was unconstitutional insofar as it

The record reveals that on two occasions during the proceedings, upon request of defense counsel, Appellant was ordered to undergo psychiatric evaluations to ascertain whether he was competent to proceed with trial. The first such request was made on February 7, 1991, the day originally scheduled for the preliminary hearing. Appellant's request for a continuance for purposes of a competency hearing was granted. On February 14, 1991, a psychiatric report wherein it was declared that Appellant was, indeed, competent to stand trial was presented to the court. The second defense request for a competency evaluation was made on July 29, 1991 during the jury selection process. Upon that request, the trial court ordered a recess and an immediate evaluation of Appellant. Appellant was then examined by Dr. Robert Stanton, M.D. who also concluded that Appellant was competent to stand trial.

Appellant submits that irrespective of the fact that he was twice evaluated and twice found competent to stand trial, the various medications that he was taking during the time of trial "necessarily" had to have affected his ability to understand the proceedings and to participate in his defense. Although Appellant lists numerous different drugs that he was given following his arrest up to and including the time of trial, and submits that he was, at times, under the influence of "psychotropic" drugs during his trial, the record evinces that at the time of trial, he was being prescribed only librium and sinequan, both of which were being given to him to relieve his anxiety. Moreover, psychiatrist Dr. Robert L. Sadoff, testified at trial that neither of those drugs would likely have been prescribed if Appellant were, at that time, psychotic. Given

required that incompetency to stand trial be proven by clear and convincing evidence. We also noted that the General Assembly, pursuant to Act 77 of 1996, has since amended the Mental Health Procedures Act to explicitly impose the preponderance standard. This amendment was signed into law by the Governor on July 2, 1996. Appellant has not at any time challenged the constitutionality of the clear and convincing standard of proof as provided in section 7403(a) at the time of trial, thus any objection to the application of this standard is waived. Even were the preponderance standard applied in this case, however, the result would be the same.

all this, we cannot conclude that Appellant's claim even presents arguable merit. As such, counsel cannot be found ineffective for having failed to pursue further the issue of Appellant's competency to stand trial. *Tilley,* 528 Pa. at 149–50, 595 A.2d at 587.

■ The next claim of error raised by Appellant is that the trial court made numerous allegedly prejudicial remarks to defense counsel thereby depriving Appellant of a fair and impartial trial. Again, this claim is framed in terms of ineffective assistance of trial counsel. In his brief, Appellant points to specific comments made by the trial judge during trial, all of which were directed solely to defense counsel and did not involve comments concerning the defendant or the issues at hand. It is Appellant's contention, however, that taken as a whole, those comments evidenced the trial court's animosity towards defense counsel, which animosity necessarily inured to the detriment of Appellant. While the record does reveal numerous exchanges between defense counsel and the court, most of those exchanges occurred out of the presence of the jury and thus, could not have prejudiced the Appellant. *See, Commonwealth v. Whitson,* 461 Pa. 101, 334 A.2d 653 (1975) (trial judge's response that defense motion for mistrial was frivolous was not prejudicial since the remark was made at sidebar and out of the presence of the jury).

The law is clear that not every unwise or irrelevant remark made in the course of trial by a judge constitutes grounds for a mistrial and that a new trial is required only where the remark is prejudicial. Prejudice will be found only where the remark is of such a nature, or delivered in such a manner, that it may reasonably be held to have deprived the accused of a fair and impartial trial. *Commonwealth v. England,* 474 Pa. 1, 375 A.2d 1292 (1977). As we noted in *England:*

> While we do not condone a display of impatience by a trial judge, even where he may have been provoked by counsel's dilatory tactics, we recognize that judges are also subject to failings of human beings and cannot be expected to be

devoid of emotion in the trying or vexing situations they may be called upon to confront.

*Id.* at 17, 375 A.2d at 1300.

Our review of the record reveals that the few remarks that were directed toward defense counsel and which were made in the presence of the jury, were not so disparaging as to prejudice Appellant in any manner. Those comments were largely directed toward maintaining order and decorum in the courtroom. Indeed, the record reveals that some of the comments were in direct response to defense counsel's re-peated objections after the trial court had already ruled on a particular matter. Many others involved the court's repeated admonitions to defense counsel to remain in a specific location while addressing the jury and/or examining a witness. And, while at times, the comments of the trial judge evidenced his impatience with defense counsel, none of those comments were related to the issues in the case; none were reflective of any predisposition of the trial judge respecting the guilt or inno-cence of the defendant; and none were indicative of any bias in favor of the prosecution. Moreover, the trial court properly charged the jury that they were to be the sole judges of the facts. In short, our review of the record reveals no intemper-ate remarks on the part of the trial judge which could be construed as creating an atmosphere of unfairness. Because this claim, too, lacks merit, Appellant has failed to establish his claim of ineffective assistance of counsel with respect thereto. *Tilley, supra.*

Appellant submits next that trial counsel was ineffective for failing to object to the trial court's limitation of cross-examina-tion. Specifically, he contends that the trial court should have permitted him to cross-examine Commonwealth witness Earl Jones regarding testimony presented by two witnesses during a trial held several years earlier wherein Earl Jones was the defendant.

As alluded to earlier in this opinion, Earl Jones, the man Appellant chased into 6135 Walnut Street, Philadelphia, was convicted in 1985 for killing Appellant's son. At the trial in

the instant case, Appellant defended the three murders that occurred in that home on the basis that his actions were in part provoked by seeing Earl Jones. On cross-examination of Earl Jones, defense counsel elicited testimony regarding the earlier murder of Appellant's son. In essence, Earl Jones testified that Appellant's son had pulled a knife on him and that he acted in self-defense. Defense counsel then attempted to impeach that testimony by asking the witness about the testimony of two witnesses, Damu Boyer and Ann Boyer, which testimony was elicited at the witness' trial in 1985. Apparently, those two witnesses testified at Earl Jones' trial that Earl Jones had threatened one of them with a knife thinking that he was Appellant's son and that Earl Jones had stalked Appellant's son. Upon objection by the prosecutor, a sidebar conference was held during which the trial court ruled this testimony to be inadmissible hearsay.

Appellant submits that such ruling was in error in that this testimony constitutes permissible impeachment testimony. He argues that such prior testimony is admissible since those two witnesses testified and were subject to cross-examination at the 1985 trial of Earl Jones. In support of this argument, Appellant cites 42 Pa.C.S. § 5917 which governs the admission of testimony presented at a former trial by a now unavailable witness. Absent from his argument, however, is any intimation that those particular witnesses were, indeed, unavailable at the time of the instant trial. And, the record is devoid of any attempt on the part of the defense to call those particular witnesses in the instant trial. Because there was no showing that these witnesses were unavailable, the trial court properly rejected this line of questioning.

Even if not properly rejected, Appellant's claim would fail insofar as Appellant is unable to establish the requisite prejudice prong of his ineffectiveness claim. *Commonwealth v. Travaglia,* 541 at 118, 661 A.2d at 357. Earl Jones was called as a Commonwealth witness for the sole purpose of relating the events that occurred on December 23, 1990, which events Appellant did not contest. Rather, it was Appellant's

sole defense that he was mentally infirm at the time of these murders. Because the attempted cross-examination in no way impinged upon that defense, the preclusion of same here could not have prejudiced Appellant. Appellant argues to the contrary that this testimony was somehow crucial to his defense insofar as Earl Jones had a "fixed bias" against Appellant and the testimony was necessary for Appellant to prove that he was motivated to commit the three murders in the house as a result of his having seen Earl Jones. We fail to discern how this proffered testimony would be at all relevant to Appellant's claimed defense or provide justification for committing those three murders. While the fact that Earl Jones had killed Appellant's son some years earlier might explain Appellant's hostility towards Earl Jones, that same fact does little towards establishing any bias on the part of Earl Jones. Moreover, the jury was already aware that Earl Jones had been convicted of voluntary manslaughter for the murder of Appellant's son and, indeed, some of the jury specifically found this very fact, that Appellant was distressed from seeing Earl Jones, to be a mitigating factor.

Appellant argues next that the testimony of the arresting officer, Detective Martin Devlin, regarding a prior arrest of Appellant's son was irrelevant and prejudicial and thus, improperly admitted. He argues, again, trial counsel's ineffectiveness for having failed to raise this issue in post-trial motions.

The admission of evidence is a matter vested in the sound discretion of the trial court, whose decision thereon can only be reversed by this Court upon a showing of an abuse of discretion. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985). In determining whether certain evidence should be admitted, the trial court must weigh the relevance and probative value of such evidence against the prejudicial impact of that evidence. *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988).

Detective Devlin testified that when he interviewed Appellant immediately following the murders, Appellant appeared

calm and sober. Detective Devlin testified that Appellant told him that he remembered Detective Devlin from an encounter several years earlier when he arrested Appellant's son for burglary. Trial counsel objected to this testimony, whereupon the court twice instructed the jury that it could consider such testimony only as it pertained to Appellant's state of mind at the time of the murders, and that such testimony should not be considered to reflect adversely on Appellant.

Appellant contends that such evidence was not only irrelevant, but also extremely prejudicial as the testimony reflected adversely on Appellant as a father. Such evidence, as it related to the state of mind of Appellant, was, however, clearly relevant as Appellant's sole defense was that of mental infirmity. The law is clear that prior out-of-court verbal or non-verbal acts of a defendant committed at or near the time of the commission of the crimes at issue are admissible as evidence of a defendant's state of mind where his or her sanity has been made an issue. *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987). Furthermore, it is difficult to discern of any possible prejudice to Appellant arising from this testimony. The testimony contained no intimation that Appellant was involved in his son's alleged criminal behavior nor that Appellant was even aware of such behavior before his son was arrested. Even assuming this testimony was somehow prejudicial, any such prejudice was adequately cured by the trial court's prompt and limiting instructions to the jury. *Commonwealth v. Morris*, 513 Pa. 169, 519 A.2d 374 (1986).

█ The next claim of error involves the testimony of Commonwealth rebuttal witness Dr. John S. O'Brien. Dr. O'Brien was originally retained by the defense for the purpose of evaluating Appellant and with the hope that he would testify in support of Appellant's claim of insanity or diminished mental capacity. Following his evaluation of Appellant in April, 1992, Dr. O'Brien's opinion was not, however, supportive of this defense and he was not called as a witness by the defense. Specifically, Dr. O'Brien concluded that, at the time of the murders, Appellant understood the nature and quality of his acts and that those acts were wrong. He diagnosed

Appellant, as of April, 1992, as suffering from depression in remission. Because of those conclusions, the Commonwealth chose, instead, to call Dr. O'Brien in rebuttal. So called, Dr. O'Brien testified as to his evaluation of Appellant and his psychiatric conclusions gleaned therefrom. He further testified that, in his opinion, Appellant was not suffering from schizophrenia either at the time he committed the murders or at the time of his evaluation in April, 1992. Dr. O'Brien explained that the Diagnostic and Statistical Manual of Mental Disorders (DSM-3R), which standardized evaluation and diagnosis of mental disorders, was developed after 1948, the year Appellant was discharged from the military due to mental infirmities. He was then questioned regarding his review of Appellant's military records. Appellant relied heavily at trial upon this discharge from the military some 42 years earlier to bolster his defense that the instant murders resulted from his diminished mental capacity because the apparent diagnosis contained in those discharge records was that of schizophrenia reaction. Specifically, the prosecution inquired of Dr. O'Brien as to what diagnosis he believed would be given today, using the current standardized evaluation and diagnostic tests, to Appellant's behavior as reported in the 1948 military records and, also whether he believed Appellant would be discharged from the military today if he exhibited the behavior he did in 1948. Essentially, Dr. O'Brien opined that based upon his review of Appellant's military records, he would not have diagnosed Appellant as suffering from schizophrenia, but rather would have first ruled out toxic psychosis or alcohol withdrawal and then, although a possible diagnosis could have been brief reactive psychosis, he would nevertheless not have given any formal diagnosis. In response to whether he believed the behavior exhibited by Appellant in 1948 would today result in a similar military discharge, Dr. O'Brien opined:

It is my opinion that if I were making recommendations based upon what I've seen in the records about whether or not he would be able to return to active duty or return to work, then I would not be recommending that he not return to work. I would recommend that he should return follow-

ing a brief period of observation and attempt an assessment [sic] of whether or not he has symptoms that warranted anything in terms of his condition and substantial treatment.

N.T. 8/13/92 at p. 24. Defense counsel's objections to this line of questioning were overruled by the trial judge.

Appellant contends that Dr. O'Brien was not qualified to render an opinion regarding whether in 1990, the symptoms displayed by Appellant in 1948 would cause him to be discharged and that such testimony was wholly irrelevant. He asserts counsel's ineffectiveness as well for having failed to raise this issue in post-trial motions. Our review of the record belies Appellant's contentions. First, it was the defense which sought to interject Appellant's mental infirmities as of the time of his military discharge in 1948 as support for his claim that, at time of the instant murders in 1990, he was insane or had diminished mental capacity so as to excuse the murders. Dr. O'Brien's testimony was, thus, relevant rebuttal evidence. Moreover, Dr. O'Brien's testimony was unequivocally phrased in terms of his opinion and what his recommendations would have been. Thus, contrary to Appellant's intimations, Dr. O'Brien did not opine that the military would not, today, discharge Appellant under similar circumstances, but rather testified only as to his opinion as to the nature of Appellant's mental condition based upon the information contained in those records. The defense stipulated at trial to Dr. O'Brien's qualifications as an expert in the field of psychiatry and, more particularly, forensic psychiatry and our review of the record reveals that his testimony was limited to those qualifications. We simply do not find that the trial court here abused its very broad discretion regarding the admission of evidence. *Commonwealth v. Martin,* 479 Pa. 63, 71, 387 A.2d 835, 839 (1978). Appellant's claim to the contrary is without merit and, therefore, his concomitant claim of ineffective assistance of counsel warrants no relief.

In his next claim of error, Appellant submits that the prosecution elicited improper opinion testimony from Detective Morton, one of the detectives to whom Appellant confess-

ed following the murders, and that trial counsel was ineffective in failing to object to that examination of the witness. Detective Morton was presented as a Commonwealth witness to testify regarding the pretrial statements of Appellant. On recross-examination of Detective Morton, defense counsel elicited testimony that some suspects who have confessed will then attempt to justify their behavior by claiming, for instance, self-defense. Defense counsel then asked Detective Morton whether Appellant made any such attempt, to which the detective responded "no." Immediately thereafter, the prosecution elicited testimony from Detective Morton that in giving their version of the events precipitating the crime, most defendants try to put themselves in the most favorable light and that "in [his] opinion" Appellant did just that by claiming that he became enraged when he saw Earl Jones. Appellant submits that this redirect testimony constituted improper opinion testimony. Appellant asserts that Detective Morton's testimony infringed upon the exclusive function of the jury to determine the credibility of Appellant's statement. In so arguing, Appellant apparently relies upon Detective Morton's use of the terms "in my opinion" when answering the prosecution's question as to whether Appellant attempted to justify the killings. In support thereof, Appellant cites numerous cases which hold that the Commonwealth is prohibited from presenting opinion testimony concerning the guilt of the defendant. For the reasons that follow, Appellant's claim here lacks even arguable merit.

Significantly, Detective Morton's testimony did not constitute an expression of opinion regarding the credibility of Appellant or his statements. Indeed, since Appellant never testified at trial, his credibility was not at issue. Neither was the credibility of his statements ever at issue. The sole dispute was whether Appellant's statements of confession supported his insanity defense. The above-referenced testimony of Detective Morton does not come close to constituting an expression of his opinion as to that disputed issue. The redirect examination at issue here constituted proper rebuttal to a line of questioning initiated by the defense on cross-

examination. *Commonwealth v. Carpenter*, 533 Pa. 40, 46, 617 A.2d 1263, 1266 (1992); *Commonwealth v. Lawson*, 519 Pa. 175, 546 A.2d 589 (1988). As such, there would have been no merit in objecting to this line of question and counsel cannot, therefore, be found ineffective for failing to pursue such a tactic. *Tilley, supra.*

Appellant next claims that the trial court erred in permitting the prosecution to elicit testimony during the guilt phase regarding his dishonorable discharge from the military. Appellant asserts that his counsel was ineffective in failing to either object to this testimony or request a mistrial on that basis. For the following reasons, this claim also fails.

The defense, in its case in chief, elicited testimony regarding Appellant's discharge from the military in 1948 due to his mental infirmities and his attempted reenlistment in 1951. The defense also presented testimony establishing that Appellant was discharged after only thirteen days in 1951 once it was determined that Appellant was ineligible to reenlist due to his earlier discharge. On cross-examination of defense witness Robert Daly, the prosecutor elicited testimony that Appellant's discharge in 1951 was an "undesirable discharge." The trial court, however, immediately cautioned the jury that such testimony bore no relation to the issue at hand and that they were to be concerned only with the events surrounding the murders and the psychiatric history of Appellant. It is Appellant's contention that evidence of his dishonorable discharge in 1951 was irrelevant and extremely prejudicial insofar as our society judges the character of males by the "nature of their participation in the military."

While we agree that this evidence was irrelevant to the issues posed in this case, we cannot agree with Appellant's assertion that this one reference so prejudiced him as to warrant a new trial. The trial court's immediate instructions cautioning the jury to disregard this testimony cured any possible prejudice that may have resulted. *Commonwealth v. Morris, supra.* Moreover, following those instructions, the prosecution thereafter ceased this line of questioning and

never exploited this testimony. In short, this isolated reference, to which there was a curative instruction provided, would not have presented any basis for the granting of a mistrial. *Commonwealth v. Young*, 536 Pa. 57, 77–78, 637 A.2d 1313, 1323 (1993), *cert. denied* 511 U.S. 1012, 114 S.Ct. 1389, 128 L.Ed.2d 63 (1994). Accordingly, Appellant's claim of ineffectiveness respecting this issue also fails for lack of merit. *Tilley, supra.*

■ In a similar vein, Appellant argues that the prosecution, again, improperly elicited testimony regarding a prior bad act when, in recross-examining defense witness, Robert Daly, the prosecution inquired as to whether Appellant ever told the Veteran's Administration of any condition which would lower the amount of his benefits. Appellant contends that the admission of such testimony was not only in violation of an earlier ruling of the trial court, but also so prejudicial as to deny him a fair trial. In order to properly address Appellant's contention here, it is necessary that we set forth the following facts from the record.

Initially, on direct examination of this defense witness and in support of the defense of mental infirmity, defense counsel elicited testimony regarding Appellant's receipt of disability benefits from the Veteran's Administration following his discharge in 1948. Through this testimony, defense counsel sought to establish that Appellant received such benefits for a continuous period of time from 1948 until at least the time of the instant trial in an apparent effort to establish Appellant's continued mental infirmities. The prosecution, on cross-examination of Mr. Daly, asked whether the amount of Appellant's pension was based upon the number of dependents he claimed. Upon initiation of this line of questioning and objection thereto by defense counsel, a sidebar conference was held. During that conference, it was determined that this line of questioning was an attempt by the prosecution to inquire as to whether Appellant ever notified the Veteran's Administration regarding the death of his wife in 1986, ostensibly for the purpose of establishing that Appellant sought to collect more benefits than he was entitled. Following a lengthy discussion of the

matter, the trial court ruled the testimony inadmissible. However, on redirect-examination, defense counsel elicited testimony that from 1970 forward Appellant never attempted to increase his Veteran's benefits. In response thereto, the prosecution then recrossed asking only whether Appellant ever informed the Veteran's Administration of any condition which would serve to lower his entitlement to benefits. The witness responded in the negative whereupon the prosecution ended its inquiry.

As eluded to above, it is this recross-examination which Appellant now challenges claiming that it was an improper attempt to elicit testimony concerning a prior bad act. Appellant claims as well that the challenged testimony was in direct violation of the court's earlier ruling and that the questions posed by the defense during redirect-examination, which occurred after the trial court's ruling, did not open the door for such questions. The record belies Appellant's contentions. The challenged inquiry was in direct response to the question posed by the defense itself during redirect wherein the witness was asked whether Appellant ever attempted to increase his veteran's benefits. As such, it constitutes permissible inquiry, even in spite of the trial court's earlier ruling. *Commonwealth v. Carpenter, supra.* Moreover, we glean no possible prejudice from the testimony ultimately elicited regarding his failure to ever notify the Veteran's Administration of any condition that would lower his benefits since that testimony did not even mention the death of his wife. Accordingly, this claim, too, is meritless.

Appellant next alleges two distinct errors with respect to the trial court's instructions to the jury during the guilt phase of his trial, claiming in both instances that trial counsel was ineffective for failing to object to the instruction.

In reviewing a challenged jury instruction, we must review the charge as a whole and not simply isolated portions, to ascertain whether it fairly conveys the required legal principles at issue. *Commonwealth v. Faulkner,* 528 Pa. 57, 595 A.2d 28 (1991), *cert. denied* 503 U.S. 989, 112 S.Ct.

1680, 118 L.Ed.2d 397 (1992). We are reminded, as well, that a trial court possesses broad discretion in phrasing its instructions to the jury and is not limited to using particular language provided that the law is clearly, adequately and accurately presented to the jury. *Commonwealth v. Prosdocimo,* 525 Pa. 147, 578 A.2d 1273 (1990).

■ Initially, Appellant submits that the trial court interjected an impermissible factor into the jury's considerations when it directed the jury to use its "street smarts" in its deliberations. In pertinent part, the trial court instructed the jury as follows:

You should consider the issues in this case fairly, impartially, and without passion, prejudice, or sympathy. You have to give careful consideration to one another's views and, ladies and gentlemen, I can't stress this too strongly, make use of all the wisdom, the common sense, the experience that each one of you has as a mature adult. The phrase I often use is to make use of your street smarts. Don't leave that quality outside of your deliberations. Bring them into your deliberations. Use your noodle. That's what common sense is. It's a shame that there is—when we talk about common sense, a lot of people have it. I assume you all have it and you're all going to use it.

It's your duty and yours alone to determine what the facts are in this case, but you must determine the facts from the evidence that's been presented during the trial, and from all of those inferences which reasonably and naturally flow from the evidence. And this is where your wisdom and your experience and your so-called street smarts are so important.

N.T. 8/17/92 pp. 60–61.

Appellant concedes that the law provides that the jury, in deliberating and rendering a verdict, is to evaluate the evidence presented and all reasonable inferences flowing therefrom by employing their common sense and every day experiences, but argues that the use of the terms "street smarts" was improper. Notwithstanding the trial court's explicit use

194

of the terms "street smarts" to mean "common sense," "wisdom" and "experience that each one of you has a mature adult" Appellant apparently wants us to find that the term "street smarts" does not mean what the trial court instructed the jury that it means. While perhaps the terms "street smarts" can be defined in terms other than "common sense," the trial court clearly and unequivocally instructed the jury that in using those terms here, it meant for them to be synonymous with "common sense." As such, we find no error in the instruction. *Prosdocimo, supra; Commonwealth v. Jones,* 529 Pa. 149, 602 A.2d 820 (1992). Accordingly, since there was no error in this instruction, an objection thereto would have been futile and, therefore, counsel cannot be found ineffective for failing to object. *Commonwealth v. Thompson,* 538 Pa. 297, 309, 648 A.2d 315, 321 (1994).

 Next, Appellant objects to the manner in which the trial court instructed the jury regarding the crime of voluntary manslaughter. The challenged instruction is as follows:

A person who kills another person without lawful justification commits voluntary manslaughter if at the time of the killing he he [sic] is acting under a sudden and intense passion resulting from serious provocation by the individual killed. Put another way, a person who kills another person under circumstances which would amount to murder is only guilty of voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the person killed.

N.T. 8/17/92 p. 98.

Appellant submits that the above charge was an incomplete statement of the law concerning voluntary manslaughter because it failed to include language contained in 18 Pa.C.S. § 2503(a)(2).[9] Appellant contends that the evidence presented

9. 18 Pa.C.S. § 2503(a) provides:
(a) General Rule—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
(1) the individual killed; or

established that he fired at Earl Jones but, instead, struck and killed Jacqueline Jones, Felicia Hubert and Alan Whitfield and that, therefore, the above charge should have included an instruction that the jury could find him guilty of voluntary manslaughter if they found that Appellant accidentally or negligently killed those three individuals as a result of serious provocation by Earl Jones. The record, however, belies Appellant's summation of the evidence. Rather the record reveals that at the time these three individuals were shot and killed, Earl Jones had already escaped out the window of the bedroom and that no shots were fired at Earl Jones. Accordingly, Appellant was not entitled to a charge under subsection (a)(2). *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994).

Appellant seems to imply that the law entitles him to such a charge even where he killed someone *after* being provoked by someone else. Appellant fails to cite us to any legal authority in support of such a conclusion nor are we able to locate any such legal authority. The clear wording of subsection (a)(2) renders this argument illusory. Because Appellant's claim lacks even arguable merit, counsel cannot be deemed ineffective for having failed to request such. *Tilley, supra.*

Appellant next complains that the trial court's instruction to the jury during the guilt phase concerning diminished capacity was in error and that counsel was ineffective in failing to object thereto or to request further instruction thereon. Appellant's sole contention is that the instruction as given failed to instruct the jury that a finding of diminished mental capacity may prevent a defendant from being able to form the requisite specific intent so as to thereby reduce a first degree murder charge to a lesser degree of murder. In so arguing, Appellant points to the following portion of the court's charge:

> You cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that he had the specific intent to kill. A specific intent to kill is a

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

fully formed intent to kill, of which the defendant was conscious. The defendant asserts that as a result of an abnormal mental condition, he was at the time of the killing incapable of that kind of intent. Obviously, you cannot find him guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant knew what he was doing was wrong and that he had the specific intent to kill.

In determining the question of whether the defendant is capable of having or did, in fact, have a specific intent to kill, you should consider all of the relevant evidence including the expert testimony concerning the existence and effects of any abnormal mental condition.

Also to be considered by you—this is separate from the insanity as a defense to the degree—is the allegation of intoxication. The general rule, ladies and gentlemen, is that voluntary intoxication is not a defense to a criminal charge. Generally speaking, a person who voluntarily uses intoxicants cannot become so drunk that he is for that reason letally (sic) incapable of committing the crime. The general rule, however, is subject to a qualification when the crime charged is first degree murder.

The defendant is permitted to claim as a defense that he was so intoxicated at the time of the killing that he did not possess the specific intent to kill required for first degree murder. The Commonwealth has the burden of disproving this defense. Thus, you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt, despite any intoxication, the defendant, despite any alleged intoxication, was at the time capable of forming a specific intent to kill, that is, a willful, deliberate and premeditated design to kill.

The Commonwealth must prove, beyond a reasonable doubt, that the defendant had the specific intent to kill, and if there's an issue of intoxication, the Commonwealth must disprove that the intoxication or any element of intoxication prevented the defendant from having the specific intent to

kill. Voluntary intoxication may reduce a crime of murder from first degree to third degree.

N.T. 8/17/92 pp. 92–94.

Appellant points to the court's specific instruction that a finding of intoxication may serve to reduce the degree of murder, arguing that the failure to similarly instruct the jury with respect to a finding of diminished mental capacity was crucial because it may have resulted in the jury not understanding that a finding that he lacked the mental capacity to form the specific intent to kill would result in reducing the degree of murder rather than acquitting Appellant. In other words, it is Appellant's contention that not having been so apprised, the jury may have feared that they would have to acquit Appellant of these murders if they found he lacked the requisite mental capacity to form specific intent.

After reviewing the entire charge as we must, we find that the trial court's instructions adequately and accurately conveyed to the jury that a finding of diminished mental capacity could serve to reduce the degree of murder charged because it could negate a finding of specific intent. Immediately prior to the above-recited portion of the charge, the trial court explained the three degrees of homicide, specifically informing them that one could be convicted of first degree murder only if the person formed the requisite specific intent. The court further instructed that homicide committed without the requisite specific intent constituted third degree murder. And, in distinguishing between manslaughter and murder, the court instructed that where the jury finds malice, the crime is murder of one of the degrees. Finally, after discussing specifically the distinct degrees of murder, the trial court instructed that with respect to each murder, the evidence should be viewed to ascertain whether it establishes any of the three degrees of murder. Accordingly, the charge as a whole adequately and accurately explained to the jury that a finding of diminished mental capacity could negate the finding of specific intent and thereby serve to reduce the degree of murder. Appellant's argument to the contrary, that this instruction could have impressed upon the jury that a finding

of diminished mental capacity would require an acquittal, is simply unsupported. Appellant's claim is therefore without merit.

■ Appellant raises one final claim respecting the trial court's instructions. Specifically, he challenges the court's instructions during the penalty phase wherein the court informed the jury that a sentence of life must be unanimous. Appellant's challenge focuses on the following portion of the instruction:

Remember, also, that your verdict, ladies and gentlemen, is not merely a recommendation, it actually fixes the punishment at either life imprisonment or death. Your verdict, whether it be death or life imprisonment, must be unanimous. It must be the verdict of each and every one of you.

N.T. 8/18/92 p. 55. Appellant submits that a sentence of life does not require unanimity. Appellant submits further that the instruction given effectively compels those jurors who are in favor of a life sentence, but are in the minority, to compromise their beliefs and agree to the imposition of a sentence of death. Appellant's claim is, however, without merit.

The jury's verdict in the penalty phase of a first degree murder case, whether it be a sentence of life or death, must, just as is true of any verdict in a criminal case, be unanimous. Where the jury is unable to reach a unanimous agreement as to the sentence, the court must impose a sentence of life. 42 Pa.S.C. § 9711(c)(1)(v). However, for the jury to return a verdict, it must necessarily be a unanimous verdict. Appellant's argument to the contrary, that the jury could impose a life sentence in the absence of a unanimous agreement, is nonsensical. The charge as given does nothing more than inform the jury that it is free to reach a verdict of a life sentence or one of death.

Subsection (c)(1)(iv) of our death penalty statute provides that a jury must impose a sentence of death if they unanimously find at least one aggravating circumstance and no mitigating circumstances or unanimously find one or more aggravating circumstances which outweigh any mitigating cir-

cumstances, and that in all other cases, the verdict must be a sentence of life imprisonment. 42 Pa.S.C. § 9711(c)(1)(iv). Perhaps Appellant here interprets this final statement of subsection (c)(1)(iv) to somehow permit a non-unanimous verdict of life imprisonment. While logic alone belies such an interpretation since a "verdict" by its very nature is a unanimous decision of a jury, subsection (c)(1)(v) also belies such an interpretation as it mandates that a court impose a life sentence where the jury is unable to reach a unanimous agreement. Indeed, the court instructed the jury regarding this very consequence of their being deadlocked. For these reasons, we find that Appellant's claim lacks merit.

The remaining claims of Appellant all involve challenges to the prosecution's closing arguments, either at the guilt or penalty phase of the trial. The standard for reviewing such claims is well settled. Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. *Commonwealth v. Gorby,* 527 Pa. 98, 588 A.2d 902 (1991). Moreover, the prosecution, similar to the defense, is accorded reasonable latitude and may employ oratorical flair arguing its version of the case to the jury. *Commonwealth v. Zettlemoyer,* 500 Pa. at 53–54, 454 A.2d at 956–57; *Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316 (1995), *cert denied* —— U.S. ——, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996). The arguments advanced must, however, be based upon matters in evidence and/or upon any legitimate inferences that can be drawn therefrom. *Commonwealth v. Chester,* 526 Pa. 578, 599–600, 587 A.2d 1367, 1377 (1991), *cert. denied* 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991). Finally, any allegedly improper prosecutorial comments must also be examined within the context of the conduct of defense counsel. *Commonwealth v. Clayton,* 516 Pa. 263, 285, 532 A.2d 385, 396 (1987), *cert. denied* 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988).

 Appellant argues first that the prosecutor, in her summation to the jury during the guilt phase, improperly expressed her personal opinion as to the guilt of Appellant and/or infringed upon the jury's fact-determining function when she argued that the evidence was "overwhelming."[10] He argues, as well, counsel's ineffectiveness for having failed to object to this portion of the summation. The comments to which Appellant now objects do not, however, constitute an expression of personal belief on the part of the prosecutor. The prosecutor made no comment regarding her personal opinion of any particular testimony or of the evidence as a whole, but rather simply argued that the jury should find the evidence of guilt to be overwhelming. Such argument is clearly permissible. *Commonwealth v. D'Amato*, 514 Pa. 471, 489, 526 A.2d 300, 309 (1987) (a prosecutor may always argue to the jury that the evidence establishes the defendant's guilt).

Appellant argues that these statements of the prosecutor regarding the "overwhelming" nature of the evidence also intimated that the defenses of insanity and diminished capacity were meritless. Clearly, the prosecutor, in the disputed portions of her summation, argued to the jury that the evi-

10. Specifically, Appellant points to the following portions of the prosecution's charge:

In order to have first degree murder, a person must have the specific intent to kill. So that is a decision every jury must make. Some juries have an added burden. They must decide whether or not the defendant on trial is the person that actually pulled the trigger or stabbed the person. In this case, you ladies and gentlemen already have that evidence. The evidence in this case was so overwhelming as to the fact that it was this defendant who committed these crimes, that the defense had to agree to that. They couldn't come in and say, well—

So what they've done is, they've presented you with three other defenses, and in some ways a fourth. But the fact of who actually did these killings is something that has been agreed to because it was so overwhelmingly clear that he had done these things. N.T. 8/17/92 p. 32.

All of these are possible defenses. The only defense that you didn't get was I didn't do it. And that's because of the amount of evidence there is in this case.

When you have considered all of the testimony you've heard, ladies and gentlemen, I think you will find that the evidence really is very clear and overwhelming ... N.T. 8/17/92 p. 55.

dence would not support a finding of insanity. Such argument is, however, perfectly acceptable as the prosecutor neither interjected her personal opinions nor in any way implicated the jury's truth determining function in so arguing. Appellant's contention to the contrary is, thus, without merit.

■ Appellant next asserts counsel's ineffectiveness for failing to raise in post-trial motions that the Commonwealth also impermissibly commented on the failure of the defense to call a witness and also portrayed the defense as having attempted to conceal Dr. O'Brien's opinion. In so arguing, Appellant points to the following comment by the Commonwealth:

Remember that although Mr. Daly indicated that they were court-appointed doctors, that's not exactly correct. Dr. Sadoff was hired by the prosecution to examine the defendant once we knew that they were going to raise this particular type of defense. And Dr. O'Brien was hired by the defense. But they didn't like his report, because he didn't find that the defendant had any mental illness. Any mental defect such that he did not know the difference between right and wrong. So they didn't call him. We did. And why is that? Because both of these psychiatrists . . .

N.T. 8/17/92 pp. 43–44.

During its closing, the defense, however, commented that both psychiatrists were court-appointed, when in fact they were not. Further, in an attempt to refute the testimony of Dr. O'Brien, the defense commented that Dr. O'Brien was "not acting in a professional manner" with respect to his findings in this case. The Commonwealth's comments were clearly made in response to the defense's own closing and, thus, constituted permissible comment. *Commonwealth v. Williams*, 539 Pa. 61, 76 n. 13, 650 A.2d 420, 428 n. 13 (1994). Because the challenged remarks were permissible, counsel cannot be deemed ineffective for having failed to raise this issue. *Tilley, supra.*

■ The remainder of Appellant's challenges relate to comments made by the prosecution in its summation to the

jury at the penalty phase. First, he submits that the following comment of the prosecutor was improper because it invited the jury to consider the possible reaction to its verdict:

We submit to you, ladies and gentlemen, that, in fact, there are no mitigating factors in this case that are not outweighed by the very serious aggravating circumstances in this case, that, in fact, this is the kind of case that calls for a death penalty, where an individual had killed, in two separate incidents, four people. Think to yourselves if someone told you I was on a jury, and the defendant had killed four people, and then told that they gave the defendant life and not death, how you would react to that?

(N.T. 8/18/92 p. 38). Defense counsel's immediate objection to this comment was sustained by the trial court whereupon the court instructed they jury as follows: "You're not to be concerned by how other people would react. You make your own decision." (N.T. 8/18/92 p. 38). Despite the trial court's admonition, the prosecutor continued:

My point is that you, ladies and gentlemen, hearing that, what would you think if someone told you that they had been on a jury and that they had not given the death penalty to someone who had killed four innocent people?

(N.T. 8/18/92 p. 38). Once again, the trial court sustained defense counsel's objection. The court then instructed the jury:

You're not to be influenced by that. You're to be influenced by the law as it will be in my instructions and not what other people might think or what you might think about other people in similar situations.

(N.T. 8/18/92 p. 38). The trial court then denied what it anticipated would be a defense request for mistrial. Then, in its final charge, the trial court, again, instructed the jury to reach its sentencing verdict based solely upon the evidence presented and not to be influenced by what others might say or think.[11]

11. Specifically, the trial court instructed:

This claim, unlike the other claims of Appellant, was, indeed, raised in post-verdict motions and ruled upon by the trial court. Specifically, the trial court found that while the comments were improper, the cautionary instructions given by the court adequately cured any possible prejudice. Based upon our independent review of the record, we agree with the trial court's conclusion that, although improper, any possible prejudice which may have resulted from the prosecutor's remarks was adequately cured. *See, Commonwealth v. Meadows,* 534 Pa. 450, 465–466, 633 A.2d 1081, 1089 (1993).

We certainly do not condone the prosecutor's rhetoric here, especially her re-emphasis of the improper remarks after an objection thereto was sustained and after the court cautioned the jury that the comments were not to be heeded. However, we are reminded that not every intemperate or improper remark of a prosecutor requires that we grant a new trial, particularly where, as here, the jury is clearly and unambiguously instructed that they should disregard such comments and, indeed, proceed contrary to those comments. *Commonwealth v. Morris,* 513 Pa. 169, 519 A.2d 374 (1986); *see also Commonwealth v. Tilley,* 528 Pa. at 143, 595 A.2d at 583 (a jury is presumed to heed the instructions of the trial court). Because the cautionary instructions given here were, indeed, very explicit and any arguable prejudice thereby eliminated, the improper comments do not constitute grounds for granting Appellant a new sentencing hearing. *Commonwealth v. Rush,* 538 Pa. 104, 117, 646 A.2d 557, 562 (1994).

■■ Appellant next claims that the prosecutor improperly explained to the jury the mitigating circumstance of age during her summation and that counsel was ineffective for

And ladies and gentlemen, I want to emphasize very strongly, you must decide this case on the evidence presented in this courtroom and not on any outside consideration. You must present [sic] and you must arrive at your verdict based on what your intelligence and your heart and your whole being tells you to do, to base it on truth, uninfluenced by what anybody else might say or think about what you do.

N.T. 8/18/92 p. 57.

failing to raise this issue. In so arguing, Appellant points to the following comments:

[PROSECUTOR]: One of the mitigating circumstances the defense is pointing to is the age of the defendant. Commonwealth submits to you that when the statute deals with age of the defendant, it's not talking about someone who has reached the age of 60 years old, it's referring to someone who is of a young age who has no ...

MR. DALY: Objection.

THE COURT: That's for the jury to weigh.

[PROSECUTOR]: Who has not yet reached the maturity of adulthood and who has not yet been able to understand and appreciate what the law requires of the individual citizen.

N.T. 8/18/92 pp. 36–3 7.

While counsel is permitted to discuss the applicable law as it pertains to the evidence presented, it is improper for counsel to misstate the law or to state it in such a manner so as to confuse the jury. *Commonwealth v. Hardcastle*, 519 Pa. 236, 255, 546 A.2d 1101, 1110 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990). In *Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710 (1994), this court reiterated the law respecting the mitigating circumstance of "age" as first enunciated in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Specifically, we reaffirmed that this mitigating circumstance refers not simply to "age" but rather to "youth or advanced age." *Rivers*, 537 Pa. at 414, 644 A.2d at 720. Because the prosecutor here asserted that the jury could consider this mitigating circumstance of "age" only where the defendant was of a young age, the challenged remarks were, indeed, impermissible. Nevertheless, these remarks do not here constitute reversible error. First, the trial court cautioned the jury that the Commonwealth's argument that age applies only to a young person was not necessarily true and that age might, indeed, be a permissible mitigating factor where, as here, there is an elderly person. The court further instructed the jury that they alone were

free to determine whether age was a mitigating factor in the instant case. Moreover, the sentencing verdict slips respecting the three verdicts of death reveal that at least some of the jurors found age to be a mitigating factor. Thus, even assuming that the challenged remarks were sufficiently prejudicial, any such prejudice was adequately cured by the trial court's instructions. *See, Commonwealth v. Carter,* 537 Pa. 233, 265, 643 A.2d 61, 77 (1994), *cert. denied* —— U.S. ——, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995). Appellant's claim of ineffectiveness thus fails.

■ Appellant argues next that the prosecutor improperly stated during closing argument at penalty phase that Appellant acted as "the executioner, as the judge and the jury." This comment was made in connection with the Commonwealth's argument that Earl Jones had been convicted and had, indeed, been imprisoned for the murder of Appellant's son, the implication being that Appellant chose, himself, to punish Earl Jones when he chased after him brandishing a rifle.

■ In support of this argument, Appellant relies upon this court's decisions in *Commonwealth v. Gilman,* 470 Pa. 179, 368 A.2d 253 (1977) and *Commonwealth v. Anderson,* 490 Pa. 225, 415 A.2d 887 (1980) wherein similar comments were found to be improper. Appellant's reliance on those cases is, however, misplaced as those cases involved similar comments made during the guilt phase of a trial and, thus, prior to the jury's determination of guilt. During the penalty hearing, where the presumption of innocence no longer exists, a prosecutor is accorded reasonable latitude and may properly comment on the evidence with reasonable oratorical flair. *Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316 (1995), *cert. denied* —— U.S. ——, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996). Indeed, we have found similar remarks made during summation at the penalty phase to be innocuous and within permissible bounds. *See, e.g., Commonwealth v. Marshall,* 523 Pa. 556, 573, 568 A.2d 590, 598 (1989). Accordingly, because this challenged remark constituted permissible conduct, Appel-

lant's claim here lacks arguable merit and counsel cannot be deemed ineffective for having failed to object thereto.

■ Appellant next complains that the prosecutor impermissibly told the jury that a death sentence was mandated by the legislature and that counsel was ineffective in failing to object thereto. In so arguing, Appellant points to the following final comment by the prosecutor:

We submit to you, ladies and gentlemen, that, in fact, this is just the kind of case that the legislature had in mind when it indicated that there were certain kinds of cases that called for a death penalty, we submit to you that this is that kind of case. Thank-you, ladies and gentlemen.

N.T. 8/18/92 p. 40.

Contrary to Appellant's contention, the prosecutor, by this comment, did not inform the jury that a sentence of death was mandated, but rather simply argued with permissible oratorical flair that a sentence of death should be imposed. *See, Commonwealth v. Duffey*, 519 Pa. 348, 371, 548 A.2d 1178, 1189 (1988); *Commonwealth v. Travaglia*, 502 Pa. 474, 503, 467 A.2d 288, 302 (1983), *cert denied*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984). Because this claim lacks even arguable merit, counsel cannot be deemed ineffective for having failed to object to this comment.

Finally, Appellant submits numerous challenges to the following portion of the prosecution's closing argument:

You've heard from the family members of the defendant who, of course, want you to spare him. However, you have not had the opportunity to hear from the family and friends of the four victims in this case, who would feel exactly the opposite. They had their relatives taken away from them without legal process and without anybody making that decision under the law. When this defendant decided to take those guns into 6135 Walnut Street and to kill those three people watching television, nobody was there to plead for them.

N.T. 8/18/92 p. 31–32. With respect to each such challenge, Appellant argues counsel's ineffectiveness for failing to object to the prosecutor's comments.

First, Appellant submits that the prosecutor here impermissibly presented testimony when she argued that had any of the victim's families testified, they would have countermanded the requests for leniency and sympathy espoused as in mitigation by the members of Appellant's family. While when viewed in isolation, these comments do cause some consternation, when viewed in context, as we must, *Commonwealth v. Carpenter*, 533 Pa. at 48–49, 617 A.2d at 1267 (1992), it becomes clear that these remarks were designed not to influence the jury to sentence Appellant in accordance with what the victim's family would desire, and, thus, on evidence not of record, but rather to rebut Appellant's evidence of mitigation, most of which consisted of Appellant's family members' pleas for leniency. Such argument falls within permissible bounds. *See Commonwealth v. Basemore*, 525 Pa. 512, 529, 582 A.2d 861, 869 (1990), *cert. denied* 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992). And, although it is improper to comment on evidence not of record, we cannot conclude that the isolated reference here made by the prosecutor regarding what the victim's family may say to the pleas of sympathy expressed by Appellant's family was so pervasive or deliberate so that the unavoidable effect thereof was to prejudice the jury to the point that they could not fairly weigh the evidence presented. Certainly, the jury could infer, even absent the above remark, that the victims' families would not be as sympathetic as the family of the Appellant.

Appellant also argues that the prosecutor's comment that the lives of the victims were taken without due process of law, was impermissible insofar as it was not based upon the evidence presented and constituted pure emotional appeal which denied him a fair and objective consideration by the jury. We have found permissible similar comments wherein a prosecutor has argued that the defendant be shown no more mercy than he showed the murder victims. *See, Common-*

*wealth v. Travaglia,* 502 Pa. at 501, 467 A.2d at 301. We simply cannot conclude that the unavoidable effect of such comments was to prejudice the jury so as to cause them to make unwarranted deductions. Accordingly, Appellant's claims lack merit and counsel cannot be deemed ineffective in having failed to object to this portion of the closing.

Having rejected all of Appellant's claims for relief, we are now obligated to determine (1) whether the sentence of death was the product of passion, prejudice, or any other arbitrary factor; (2) whether the evidence fails to support the finding of any of the enumerated aggravating circumstances; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant. 42 Pa.C.S. § 9711(h)(3).

██ Based upon our independent review of the entire record we have determined that the sentences of death imposed here were not the product of passion, prejudice or any other arbitrary factor. Instead, we find that the sentences of death were based upon the overwhelming evidence that Appellant was neither insane, acting under diminished mental capacity nor intoxicated so as to negate the element of specific intent. We also find that sufficient evidence exists to support the sole aggravating circumstance found by the jury in each of the three death sentences that being that Appellant had been convicted of another murder, committed either before or at the time of the offense at issue. Lastly, with respect to the final statutorily mandated consideration, and in accordance with our decision in *Commonwealth v. Zettlemoyer,* 500 Pa. at 63, 454 A.2d at 961, we have performed an independent review of the cases involving the sentence of death to determine whether Appellant's sentences of death were proportional to the sentences imposed in similar cases taking into consideration both the circumstances of the offenses and the character and record of Appellant. Based upon that review, we find that the sentences of death in this case are neither excessive

nor disproportionate to the sentences imposed in similar cases.[12]

For all the foregoing reasons, we uphold the convictions and the judgments of sentences of death.[13]

NIX, Former C.J., and Montemuro, J., who was sitting by designation, did not participate in the decision of this matter.

12. As part of our proportionality review, we have examined the sentencing data compiled by the Administrative Office of the Pennsylvania Courts.

13. The Prothonotary of the Supreme Court is directed to transmit to the Governor's Office, within ninety (90) days, the full and complete record of the trial, sentencing hearings, imposition of sentence and review by our court. 42 Pa.C.S. § 9711(i).